Thank you all for your patience. We had a few technical challenges this morning. Before we get into our cases today, there's one happy piece of business to take care of. I'll ask my law clerk Abe Dyke to come forward. And Abe is now officially a member of the California Bar. And because of that, eligible to be admitted here in the Third Circuit. And I move his admission as one fully qualified. I have the honor and dignity of appearing before this court. Any objection from you, Judge Nygaard or Judge Davis? Not at all. All right. Then I'll ask the court to administer the oath. Raise your right hand. Mr. Wright, do you solemnly swear that you will demean yourself as an attorney and counsel of the court, uprightly and according to the law, and that you will support the Constitution of the United States of America? All right. Congratulations, Abe. Thank you. Okay. We'll call our case this morning. Our first and our only one for this panel, Consol Pennsylvania Coal Company v. Federal Mine Safety and Health Review Commission. Mr. McHugh, you may come forward and begin. May it please the court and counsel, my name is James McHugh, and I represent Consol Pennsylvania Coal Company LLC in this matter, and I would reserve three minutes for rebuttal. Consol raises several assignments of error in its brief, but I'm going to jump to the most important one. The most important one relates to burden of proof and interpretation of a statute and regulation. Specifically, 30 CFR 5010B and the statute upon which it's based, 30 U.S. Code 813J, have three elements. The first element is that there must be an injury at the mine. The second element under 30 CFR 52H is that that injury must have a reasonable potential to cause death. Wait a second. We're all into that. Okay. But it says it's not the operator in the statute realizing, but in the reg knows or should know it has a reasonable potential. So where does it say that it in fact has to have a reasonable potential of death? In the 52H, Your Honor, 50.2H, which is the definition of accident. And the commission, Your Honor, holds that that is a triggering event in Cougar Coal and also in this case. It says 50.10B says an injury of an individual at the mine which has a reasonable potential to cause death. That's the regulatory focus, right? That provision? Yes, Your Honor. But what the commission has held is that whether to go under that regulation is triggered by an accident. And it refers in the case law, Cougar Coal, to 50.2H, which defines accident as an injury having a reasonable potential to cause death. So do you see a difference between those two things? There's a 50.10B and this one you just quoted both refer to injuries which have, injury has a reasonable potential to cause death and accident which has a reasonable potential to cause death, right? Yes, Your Honor. But you seem to say that the focus on that is to say that the fundamental point of departure here between the two sides is this question of whether uninterpreted observations of witnesses related to medical issues can suffice as proof of a reasonable potential to cause death. So am I correct in understanding that in your view the real point is you have to have medical proof of a reasonable potential to cause death in order for there to be any liability or openness to sanction? Yes, Your Honor. My view is that in order to hold the consul liable for a punitive standard, the standard says that an accident must have reasonable potential to cause death. So as a matter of fact, the secretary has to prove that. Hold up. Pick with me. Your assertion is to carry that burden, the secretary had to have a doctor come in and testify or something like that, medical evidence. And somebody had to come in with medical training and say, we looked at this person, we studied, we did tests and there was a reasonable possibility of death. Is that right? That's not exactly on point, Your Honor, and I'll tell you why. In the commission's view of the world, hearsay is admissible. I don't like it. It doesn't allow you to cross-examine the witness. But in cases up to this point, up to this case, the secretary always presented somebody, whether it's a paramedic or an EMT or a doctor, or they had the inspector go out and interview the doctor. There was an EMT who testified here, right? There was an EMT, Your Honor. Okay. And Shannon Smith described in some detail his observations, correct? He did. In fact, I'm curious whether you disagree with the rendition of the facts that's given by the government on page one of its answering brief. I picked up six things they said, and I just want to make sure that they're right when they say you don't disagree with this. First, the miner was crushed and trapped between two multi-ton pieces of equipment. You don't disagree with that, right? I would agree that he was in between two pieces of equipment, and they came together, and he was hurt, and he fell down. Well, you know, you can dance around language, but he got, he was in fact, as he put it, pinched. I mean, there was a ten-ton scoop and a five-ton rail car, and he got smashed between them, didn't he? He was caught in the cleaning drawer, and he fell to the ground. Well, you make it sound like this was like a feather touch. The rail car rolled into him, and you get five tons against ten tons, and even being in between, you wouldn't call that a crush or a smash? You think that's just that he was kind of caught like a finger in a door jam, a little bit of a pinch? No, I'm not saying that, Your Honor. I mean, what happened is the chain caught the car. This is significant, because you want to stay away from that, because it's a piece of evidence you don't like, but it's real, isn't it? I mean, it happened, didn't it? I don't want to stay away from that. I think that that's a fact. Okay, so it's not the ground to fight your case on. Right. My case is based on the fact that there's an element that the Secretary's missed, and they've rewritten, the Commission rewrote the standard. The fact is, he's pinched, crushed, trapped, however you want to call it, between two several-ton pieces of equipment. When they move it, he falls to the ground and can't move his legs. That's the next thing they say. You agree with that or not? He was able to move one. He didn't feel one. He had a fractured pelvis. Smith, on the scene, believes the guy can't move his legs, doesn't he? I think it was one leg, Your Honor. They say two, but I think it was one. Oh, okay. We'll figure it out. And it was basically up like this, and he pinched it. He looked at the bend in that knee, and he thought there was some serious problem with that leg, right? That was McDonald, Your Honor. Right, okay, McDonald. Both McDonald and Smith noticed that the surgeon's got a distended abdomen, and it's getting hard, and they suspect internal bleeding, right? Both of them. Both of them did see that, and they both said that that could be internal bleeding. Might not be. Could be other things. Could be muscle problems, but could be. They thought it could be internal bleeding, and they both acknowledged that could be life-threatening, right? They acknowledged that internal bleeding can be life-threatening. No one ever asked them if this internal bleeding was life-threatening. Well, let's just stick with the logic here. If they see it, they see it happening on the scene, and they think this could be internal bleeding, do you think they were thinking, but not internal bleeding that was threatening? This guy's life. I mean, they both said internal bleeding can be life-threatening. We thought this guy might have had internal bleeding, right? Your Honor, Mr. McDonald specifically was asked the question, do you believe that the injuries had a reasonable potential to cause death? I'm aware of that, and that came later. I'm just asking you a real straightforward question. They both saw the stomach. They both saw it getting hard and distended. They both thought that could be internal bleeding. You acknowledge that? They both thought it's possible that it would be internal bleeding. And they both acknowledged that internal bleeding can be fatal, right? Depending on the type of internal bleeding, but they didn't know that this was. Right. Okay. The next thing that the government says is he screamed in pain when moved, and was in tremendous pain. Agreed? As anyone would in an accident. Yeah, because when you get crushed between a five-ton rail car and a ten-ton scoop, you're probably going to be in severe pain. Okay. Number five, Stern says to somebody, listen, tell my wife and family I love them. That's right? Nobody disagrees with that? Nobody disagrees with that, Your Honor. Yeah. Isn't that sort of traditionally understood by people when things like that get said? It's not like a, hey, I'm not sure I'll be able to make a phone call later. That's Stern's impression that he's in a life-threatening situation, isn't it? I don't agree with that, Your Honor. I just don't agree with that. You're just like randomly saying to co-workers, girl, I love my family. No, if I was injured... Just what just happened? If I was injured, I'd probably say the same thing. You would say that if you scraped your knee? No, probably not, Your Honor. You'd say it if something happened that you thought I might not make it, right? Isn't that sort of the logical conclusion coming out of that? That's the logical conclusion that was drawn, Your Honor, by the court. Okay. And last, they say he was evacuated to the hospital by ambulance and by life flight. Is that accurate? He went by ambulance, and they transferred him. I believe they transferred him to a life flight about midway because they couldn't fly because it was foggy, and I think they did. So that's not real clear because we don't actually have any medical records from the day of the event. Counselor, our standard of review here is a substantial evidence standard. I'm very surprised you're fighting on these facts. I took your position to be a legal position that this is based on ex-post medical evidence, but that's very surprising because this is basically a tort. And where in tort law do we look ex-post at what experts say as opposed to this new or should have known? I took your position to be it has to in fact be an accident, but then why do we have this language about reasonable potential to cause death based on something you're supposed to be assessing within 15 minutes? You're not saying there has to be a medical pro at the mine in those 15 minutes, so are we supposed to be using hindsight here? Is that your position? Well, you're on my position. First of all, this is not a civil case. This is actually a civil penalty case. So it's a penalty case under the Drabo case that this court talks about. These kind of regulations are supposed to be interpreted narrowly, not broadly. Okay. Tort has penalties too. And where in even penal tort law do we require an ex-post analysis of whether in fact someone wound up dying? I mean, if he goes off and he goes to the hospital, but at the end he says, oh, it's just a flesh wound, does that make everything better? No, what I'm saying is that the statute and the regulation, whether the commission wants to find it or not, it has an element that the secretary must prove, and that is that the injuries in fact have a reasonable potential to cause death. But is that measured at the time that the layman is seeing him at the coal? Or is that measured after the fact based on all the x-rays that come out later? What's your position? My position, Your Honor, is that at the time by a layman or afterwards by an expert, for purposes of them proving that we violated the standard, they must present evidence as a matter of fact, and that's after. But as far as whether or not we violate the third element of the offense, which is report within 15 minutes of when you realize or know or should have known that there's an injury with a reasonable potential to cause death. As far as that third element goes, that is based on what our people are doing. You want to require both the layman at the mine and you have to have ex post evidence that the person in fact was going to die. For purposes of them proving the essential elements of the offense. So the answer is yes. Yes. The answer is yes. What other body of law depends upon an ex post assessment? What other tort, even penal tort, depends on an ex post assessment of whether in fact the person was going to die rather than what it looked like? Your Honor, I didn't like the statute. The statute says that that's an evidentiary burden of the secretary in order to prove the offense. The answer is you're not aware of anywhere else in the law where we look ex post. I'm not aware of any, Your Honor, but I didn't analyze it from that perspective. I mean, negligence is negligence. I mean, I'm not sure what Your Honor is getting at, to be honest with you. Well, we're trying to understand your argument. I think you've just said it is your position. It's clear and brief that I think that, yeah, you believe there is an obligation to bring in medical evidence after the fact and judge your liability under this statute. It's a regulatory regime based on that ex post. Yeah. Okay. You've just said this is a punitive provision and has to be read narrowly. What is punitive about the notice requirement? Penalties are obviously punitive, but what's punitive about a punitive notification provision? The punitive I was talking about is when, like, for example, in the Drabo case, OSHA wanted to apply a specific shipbuilding standard on a shop. And this court said, well, we're going to apply the standard as it's written. What's punitive? What is punitive about 15 minutes? There's nothing punitive about 15 minutes, Your Honor. What's punitive is when you hit somebody with a penalty. Penalties are punitive. That's true. But we have, in the SRS case, we didn't say that this regulatory regime was punitive. In fact, we said it was remedial and to be given broad scope, right? I'm not familiar with the language. I mean, I'll read it to you if you want. When reading the act, we are mindful that the canons of statutory construction teaches to construe such remedial legislation broadly so as to effectuate its purposes. This is 812J, and the regulatory analog to it are viewed, according to us, as remedial legislation. Isn't that, in fact, what they are? They came in the aftermath of three fatal accidents that were meant to remedy a problem, right? It's a safety-related accident. How do we get from remedial, based on our own precedent, remedial legislation to be given broad scope, to your view, which is you've got to look at this really narrowly? Well, Your Honor, my concern is that in this case, or in any of these cases, applying the statute, if you apply the commission's rule, you could find somebody that they violated this standard, even if there was no reasonable potential to cause death. You could find – I mean, if you follow the judge's – Look at it after the fact, right? Pardon? I mean, that's only if you look at it after the fact. If you apply the standard the way they're describing it to us, you could have somebody who looked on the scene like they were going to expire, and afterwards you discover, oh, those signs and signals, you misinterpreted them. But it's only by looking at it after the fact that you get to the concern you've got, correct? Well, no, Your Honor. Well, yes, because element two is the first – you've got to get back to element two, reasonable potential to cause death, before you get to this idea of whether or not somebody actually realized or knew or should have known. What do you make of the fact that Consol ranks Stern's injury as a high probability to cause death, and five on that zero to five scale? Your Honor, they did not rank the injury. They ranked the accident. And that's what the judge and the secretary kept confusing during the hearing. Mr. Marlow testified that that sheet was ranking the accidents and how likely they might cause a death or a serious injury. For example, there was a guy that got out of his car and it rolled downhill. They ranked it as a four, but he only had minor injuries. Wait a second. It's a fine point, except it undercuts what you said earlier. You said earlier that the accident element is the objective one, and you admit that the accident was ranked zero to five, and now you're talking about the injury not having been ranked that serious, but it's the injury that has the knew or should have known applied to it. It's the accident that is the basis for your objective arguments. But the accident that's used in the RPI, that's an internal document from Consul. They weren't attempting to apply the terms of art that are used in the Mine Act. They were just basically saying, this is an accident, and if you repeat this over time, somebody's going to get killed. Okay, so it's an accident, and it meets the definition. You think that the internal definition is substantially broader than the Mine Act's definition of an accident as something that has this potential likelihood. You just said, if you repeat it over time, some people are going to die. If you repeatedly run a ten-ton and a five-ton against each other, you don't want to be in the middle of that. So then why isn't the second element that you articulated satisfied, even if it is a discrete element? Your Honor, because they had no intention of that being – it's an injury-based standard. It talks about whether the injury has a reasonable potential to cause death, not whether the accident has a reasonable potential to cause death. I thought you said under H that it's the accident. No, an accident is defined as an injury that has a reasonable potential to cause death. Okay. It ties it back to accident, right? The regulation itself. I mean, one can have a problem with that being very circular, but it is what it is. And as you've acknowledged, and as you started your argument with, that's where the definition of accident comes in. And this is not a new theory that Consul has. This is the first case where someone's gone to court and they have not presented somebody that says, hey, I think these injuries had a reasonable potential to cause death. This is the first case. Where what you're saying is they needed some expert. They needed somebody with medical qualifications to say, in my opinion, it has a reasonable potential to cause death. And the ALJ, when this standard first came out, they had to help them do that. When you say this is the very first case, it's not the first case where they've said totality of the circumstances. It is the first case where they actually adopted a totality of the circumstances. They rejected it in Signal Peak and Footnote 8. I thought Mainline Rock, which you tried to distinguish, was pretty clear. It quotes the commission in Secretary of Labor v. Consul Cole, an 89 case, saying that the immediateness of an operator's notification under Section 510 must be evaluated on a case-by-case basis, taking into account the nature of the accident and all relevant variables affecting reaction and reporting. That's an 89 case from the commission. Isn't that nothing except totality of circumstances? Well, it's called relevant variables. This is the first time they actually called it totality of circumstances, but they don't really mean totality of circumstances because they cut the evidence off at 15 minutes. So they don't really mean totality of circumstances. They mean the totality. They're talking about the immediateness of the operator's notification. That means it has to be the totality of circumstances within that 15-minute period. How could it possibly mean you have 15 minutes to look at the totality of circumstances and make a decision, but we'll decide later whether your 15 minutes was right or wrong? They're talking about the 15 minutes, aren't they? I think they probably are there. Well, you don't have to think it. They're saying it. The immediateness of an operator's notification must be evaluated. They're talking about that 15-minute window. As element three, after element two, Your Honor. Let's ask about this. Maybe we can look at this another way. The point of this statute is to require and encourage mine operators to report serious accidents promptly, right? It is, Your Honor. And so to do that, you tell them they should, and then you penalize them. You impose a fine when they don't so that they will do that, right? Agreed. So what would the point be in having a standard that wasn't fundamentally about whether the mine operator behaved well or badly in those 15 minutes? What's the point in limiting it to the, okay, you get out from under this penalty if it turns out that the person wasn't, you know, at grave risk of death? They didn't have a reason. Why would your reading of the statute make any sense? My reading of the statute would make sense because that's what the statute says. I mean, you know, in order to do away with it, you're doing away with it now. This is what it says or we wouldn't be here, right? We're here because you say there's some problem in the statute that gives you this opportunity. But what is it in the text that you think gives you a leg up or a hold for saying, yeah, it's right and proper to ignore what happens in the 15 minutes and pay attention to the medical events later? I'm not in any way, shape, or form saying you ignore what happens in the first 15 minutes. What I'm saying is the secretary, if they're going to approve a penal statute, the first thing they have to do is prove that there was a reasonable potential to cause death, and that's not new. The ALJs held them to this standard for years, if not a decade, and then it started to change, and they started to conflate the third element with the second element. It used to be, when the standard first came out, IMSHA would go in and they would try to go with this totality, not totality, they would go with basically the facts, and the judge would say, well, where's somebody that says this has a reasonable potential to cause death? And the secretary didn't put anyone on, so the judge would vacate the citation. There's like five cases like that. I cited three of them in my brief. Deal with Mainline Rock. Mainline Rock, a 2012 case, 10th Circuit, says that the person on the scene, the operator, easily could have asked what happened and immediately learned Avita had been pulled through the roller. In other words, could have looked at the circumstances. That knowledge alone would have allured into the severity, the accident, and the potential for death. In other words, that's the 10th Circuit saying you don't need somebody to come in and say, hey, if you're crushed between two rollers, that's really severe, and that presents a potential for death. You don't need a doctor to come in and say getting crushed between rollers is really, really bad for you. What's wrong with the 10th Circuit's reasoning? Well, in that case, your honor, if I recall that case correctly, the fellow had a misshapen head. And in that case, what happened was, I think they might have relied on the Cougar-Cole case, which adopted some of these per se categories of injuries that don't require the secretary to prove reasonable potential to cause death. No, there's nothing about Cougar-Cole in what I've just read to you. This is language from the 10th Circuit saying what I think ought to be obvious, which is some things are just so bad, you don't need somebody who's a, quote, expert, unquote, to come in and say, wow, that could kill you. Well, MSHA adopted or MSHA and Cougar-Cole came up with a series of things that they think fall into that category. Go to Cougar-Cole. I'm asking you about mainline rock. You say this is unprecedented. I'm reading to you from a case from the 10th Circuit where they say, in effect, you don't need an expert to tell you something which is obvious. You get your head caught in a roller, that can kill you. What's wrong with that reasoning? I'm not familiar with the underlying facts, your honor, but I suspect if we look back in that case, we will find that MSHA actually presented somebody that said that those injuries had a reasonable potential to cause death, or they relied on the per se categories that MSHA came up with, which, you know, isn't in the law. Yeah, what do I do with the language? That knowledge alone would have alerted him to the severity of the accident, potential death. In other words, that's all you need to know. Get your head caught in a roller, that can kill you. And, again, there's... You think that's not good law? I'm saying, your honor, that they're talking about the accident, the severity of the accident, again, and I'm saying... The severity of the accident and the potential for death. The potential for death is making a reference to Mr. Avita dying. You just think that's not good law? No, what I'm saying, your honor, is I think this is an injury-based standard, and maybe it wasn't raised to the Tenth Circuit like I'm raising it here. Perhaps they didn't argue that there's a three-element test. You know, I don't know what went into that. I mean, I can't say. I think there's three elements here, and I think unless you get past the second one, you don't even... You don't get to the third one, and you don't... Then you don't... You don't get into this reasonableness of the 15 minutes. All right. I think we got you all right, Mr. McHugh. Unless, Judge Hinegaard, do you have any questions? I have no questions. Thank you. All right, we'll have you back on rebuttal, Mr. McHugh. We'll hear from the government. Good morning, your honors. My name is Cheryl Blair-Kievsky, and I represent the Secretary of Labor. Seated with me at the council table is Ms. Jennifer Gold, who did the trial work in this case. Your honor, you talked about the mainline case. That's great law. This is exactly what this case is. This minor... Well, it's not quite exactly this case, right? I mean, the mainline law, the man's a heck of a guy, rollers, and that's real obvious to anybody that you get your head pinched in, and it comes out in this shape, and your skull is crushed, you could be dead. I think their position to be, and what I'm hoping you will meet, that you really need to have... It's not inappropriate. They should be able to say, when things are unclear during that 15 minutes, you can bring in evidence later from medical people who will tell you, no, it wasn't clear, and guess what? He, in fact, wasn't in a life-threatening situation, and that should be meaningful. Why ignore what medical people say later? It wasn't ignoring, your honor. They just gave it less probative weight than the contemporaneous stuff that happens in 15 minutes. After Sago, Aracoma, and Darby, your honor, the Mine Safety and Health Administration and Congress were rightly alarmed that their mine operators out there who were not calling in to let MSHA know that there was an accident. And that's all a given. We understand that. So, your honor, subsequent to that, the Miner Act implemented redundant language in 50.10. It used to just be 15 minutes. Call MSHA within 15 minutes after there's an accident that has the potential to cause death. After 2006, after those hideous mine accidents, they included redundant language. It's not only 15 minutes. It's at once. It's immediate. They included this redundant language to put operators on notice that they were serious and added a... Right. Now, I understood. I took your adversary's position to be that because 50.10 has both the accident requirement and the new or should have known, that there's a negligence from the point of view of the operator as the third element. We described this different. The second element, the actual accident has to have, in fact, had a reasonable probability of injury. So, how do we operationalize that? I mean, are they right that there's a burden of proof on you to come forward with medical evidence or is it enough for them to have the opportunity to rebut it? I'm a little... Your Honor, if there's medical evidence that could be had in 15 minutes, absolutely. Congress was specific. You have 15 minutes. The commenters during the Miner Act thought about an hour, thought about 30 minutes, and they said absolutely not. It's a drop dead number of 15 minutes because if 15 minutes is not good, if 20 minutes is good... Right, but in lots of other cases, your adversary's point is you introduce evidence of things that happen after the 15 minutes, right? The person in the emergency room sees this and describes what he saw, and that's relevant to how we assess what the accident was in those 15 minutes. Absolutely, because you can't separate the injury from this whole accident. Right. And that's a... So, why is their complaint is you're happy to look at the medical evidence when it supports you and you tell the courts to ignore it and you ignore it when it doesn't support you. Well, I don't know... And here you had a situation where, yes, things were chaotic at the scene, but things are always chaotic around an accident. So, if the definition is chaos at the scene, then everybody loses who's a mine operator. They can never win because you throw the medical evidence out if it discounts what happened at the scene and you bring it in if it helps you. What's your response? Well, that's not accurate because they didn't score... It's like what happened here because they had medical people who said that bleeding is going to resolve on its own, you're going to be fine. And, in fact, he was fine. Yeah, but your Honor, are you saying that we must have something negative? For example, if this miner had died, then it would have been okay. The fact that the bleeding stopped is great from his discern, but we didn't know that in 15 minutes. There was no indication that this bleeding would have stopped or where the bleeding was coming from. So, that's the problem. Yeah, I'm clear on that. I'm trying to get you to meet your adversary's argument. Your adversary's argument is the government is asking you to accept the standard where they get to bring in medical evidence when it's good for them and they get to tell the courts you must ignore it when they don't like it. That's the position they're taking. And, in fact, you're acknowledging here that then your argument is who could have known in that 15 minutes, so don't worry about that later evidence. Well, your Honor, it's not like the judge and the commission ignored that later evidence. They gave it very little probative weight. That's within a judge's purview to give as much weight as he needs to or not to the evidence presented. And I would argue that this case in the first 15 minutes was so strong. This guy was screaming. He's lucky probably to be alive. These two huge pieces of equipment, he could have been cut in half. Thank God he wasn't. You might be right on these facts, but your regulatory position is pretty aggressive. Now, this is not the adversary, but in a different case it could make a difference. The statute says the person has to actually realize, but the reg says, oh, if he knew or should have known, that's enough. So you're really taking an aggressive position of expanding the statute beyond what the mine operator realizes or is aware of. But your Honor, there were people there who knew and should have known. In this case, there are people there who arguably actually did know. Exactly, your Honor. There were two EMTs and one, two licensed EMTs and one trained. But is your agency in the position, have you been imposing these penalties in cases where you have people who treat it like it's nothing and then later on they're like, oh, that was a pretty serious hemorrhage, actually? I don't know of any cases, your Honor. I mean, 15 minutes is 15 minutes. You need the case president to say, if you have a case like this, and you're not sure, err on the side of be cautious and talk. How longstanding is that interpretation, the err on the side of reporting? Because that's one of your points. But is that well established? Yes, your Honor. Where should we look for that? I think Stiglopi. Okay. If that's so, meet your colleague's concern expressed repeatedly in the briefing, that that puts the burden of proof on its head by presuming that anything that's questionable requires reporting. You in effect put the burden of proof on the mine operators when the burden is supposed to be on the government. Your Honor, I think this is a simple request. It's simple. Somebody is injured, call within 15 minutes. And in this case, your Honor, as we've... I'm trying to ask you a technical point. Okay. The technical point I'm trying to get you to answer is this. They say as a matter of law, you're asking us to impose what amounts to a presumption. A presumption that if there's a question, you have to call. In other words, all doubts are resolved against the mine operator. They say that effectively turns the burden of proof, which the law says is supposed to be on the government, on its head. What's the legal response you have to that? That we should have the burden of proof, your Honor? The government should have the burden of proof? Is that what you're asking? I'm sorry, I did not understand your question. Let me try it again. You've acknowledged here that the government's position is whenever it's questionable whether to call, the obligation is to call. Right? That's the government's position. And in fact, liability will be imposed if a call isn't made under those circumstances. Their argument is, if it is the government's burden to prove that we should have called, and every time there's a question about whether to call, they can say you should have called, that amounts to a presumption against us and puts us to the burden of proof of showing we shouldn't have called. When in fact it's your burden to prove we should have called. So your government position turns the burden of proof back on the mine operator when it's supposed to be carried by the government. I take that to be their position. Mr. McHugh can correct me if I'm wrong. I'm trying to get you to meet that argument and explain why it's wrong. Your Honor, I'm trying to concentrate on this case and these facts. Right, but we have to look beyond this case. I understand it, your Honor. But I think when it comes to reporting a notification to MSHA, you have to look at the cases on a case-by-case basis, because these cases are so fact-specific. In this case, there is no doubt in my mind that the factors in this case prove that these people at this mine knew that this miner had the possibility of dying. He didn't die, and for that we're grateful. But just look at the evidence. So are you saying that a way we could approach this case is to say there's a dispute about whether this flips the burden of proof, but we don't have to worry about it in this case, because even under the most generous view of this, from their perspective, they'd still lose? I would say that's the correct statement, your Honor. This was not a small injury. This guy was almost cut in half, we would argue, and he was screaming in pain. He was saying goodbye to all that stuff that you acknowledge. You've got some good facts on your side. Yes, we're lucky. But part of the question is how broadly do we rule here, because if your adversary's characterization of your position is right, and the more aggressive positions in your ruling are right, then basically the mines are always going to lose. Well, that's not true, your Honor. Not every case has an injury that's critical as this one. You've got to call for every accident, and they don't. This one, it seems like the stars are all aligned. There was somebody who was a responsible person within 900 feet of where this accident occurred, and just go on, he was trained, he knew, he knew to defend his stomach, he knew all of these things, he called for life. When Mr. Smith came on board, this accident happened four years after Shannon Smith. So you're in the should-have-known piece here, because Mr. McHugh says, I didn't think it was life-threatening. And your position essentially is, well, you should have known it was life-threatening, right? Okay, that puts us right into the zone of asking whether you've gone beyond the statute and you're permitted to do it, because as has been argued by your opponent, the statute says realizes, which one could say is just a historical fact you knew. You should have. And the regulation, which goes beyond no, and says should have known. So we'll back to Judge Beavis' question. Are you allowed to do that? Are you allowed to take a statutory command, which holds people liable for stuff they know, and start holding them for stuff that you, as administrators, think they should have known? Your Honor, in this case, we are certain that they knew. Mr. McDonald and Mr. Tennant were two supervisors who used this exact kind of a case. As a matter of fact, their own brochures, their teaching materials, used this case, the Stern case, as an issue that should never have happened because it has such a high potential of someone dying. They used it, and they knew. This is a red zone, and their teaching is this case is called red zone cases, and this was one of them. Your Honor, here we're in another posture where, from the government's perspective, in fact, the Commission did do this. I take it you're suggesting we do it, too, and say, well, no, should have known. We don't have to get into that, because here they knew. They absolutely did. They absolutely did. And it wasn't one person. There were three supervisors, and then this mine had this unique posture of selecting men, trainers. They trained men who were responsible people. And for argument's sake, let's say there was not a foreman around, a responsible person could call. And in this case, Your Honor, all the stars were aligned. The phones were working. They were calling everybody else, but did not call MSHA. Okay. Let's move since we only have a few moments left. You argue for deference here, for us to give deference, that your opponents say, listen, the Commission and the ALJ both indicated that the regulation and the statute are unambiguous. If the regulation and statute are unambiguous, there's no basis for deference, is there? Your Honor, we agree with that finding, that it's unambiguous. But then what is there to defer to? If it's unambiguous, we don't defer under Chevron or AL, right? That's correct, Your Honor. Okay. But you have to respond to opposing counsel that brought it up. Understood. Judge Nygaard, sir? I have nothing. Thank you. All right. Thank you, Your Honor. Thank you, Ms. Kiciewski. Appreciate your argument. Mr. McHugh will have you back on the mic. I have four points I want to make. First is, if this fellow was almost cut in half, why is it so hard to bring somebody in to say that his injuries had a reasonable chance to cause death? The second thing is the administrative interpretation in response to a question is very aggressive here because basically what the ---- I have not seen a Chevron argument here. I've not seen an argument of a disjunction between the statute and the rest. Your Honor, I've said that there should be no deference because ---- Could you please show me where in your brief you explicitly argued that? Chevron was cited in our brief on 1920 and 37. That's the General Standard Review, Section 1920, and then at page 37. I think that might be referring to the penalty. It is a discussion of then-Judge Gorsuch criticizing Chevron in a concurrence. I don't see an argument that there's a gap between this statute and this reg. Your Honor, in the first section of my brief, I flat out say that ---- Let me pull my first section. I say that the judge has greatly expanded what the meaning of the ---- Okay. Let's see if I can find it here. I'm not finding it right now, Your Honor. But I would say that I do think the judge rewrote the standard. I know it's in here somewhere. I'm just having trouble finding it right now. The judge changed the standard. The other point is the thing about shifting the burden that the court was talking about, that's just one symptom of how the commission and the ALJs, they always leave these things like ---- Another one is you can't wait for clinical proof in order to make your decision. Yeah, but how could it be workable otherwise? How could they effectuate the remedial purpose that Congress clearly had unless they took the position that you should err on the side of calling? If you're not sure, make the call. How could this be fulfilling the purpose Congress clearly had in mind if that were not the standard? Well, it's an admonition to do. That's not the standard, Your Honor, because that's not in the regulation. But it's an admonition. If you get past the second element, obviously, and you make a wrong call on the third element, you're going to be held accountable for a penalty. So it's kind of an admonition. Report more often than not. But that doesn't mean you're guilty of a citation. In order to find the guilty of a citation, you have to prove the elements. And then if there is no deference, then in this case, as the court was asking about, then you look at whether or not the judge's reading is consistent with the plain meaning of the statute. And it's not. But your focus is still on the plain meaning of the regulation throughout your brief. A regulation. Okay, right, which is a different argument from the plain meaning of the statute. Well, I see what you're saying, Your Honor. Okay, Chevron statute versus our regulation. I mean, so what I was talking about in the context of he rewrote the regulation, I should have been more clear on that. I said statute. I'm sorry about that. All right. We'll give you like 30 seconds to wrap up if you've got something else you need to say. Okay, the only thing I was going to say was on the penalty. I think words have meaning. And I think if the court looks at the penalty statute where it says that the secretary shall assess, that's what the secretary did here. But as far as the minimum penalties at the court. We've got your brief on that. Thank you. Okay. Thank you, counsel, on both sides for assistance in your argument here today. We've got the matter under advisement. We'll get back to you as soon as we can. Please testify. All right. The court stands adjourned until Wednesday, January 26th, at 5 a.m. Thank you.